J-A13032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY OFFICE OF CHILDREN, YOUTH AND FAMILIES | : | |
| | : | |
| | : | |
| | : | No. 1462 WDA 2023 |

Appeal from the Order Entered November 29, 2023
In the Court of Common Pleas of Allegheny County
Orphans' Court at CP-02-AP-0000239-2021

BEFORE: OLSON, J., SULLIVAN, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED: JULY 11, 2024**

The Allegheny County Office of Children, Youth & Families (CYF), appeals from the order denying its petition to terminate the parental rights (TPR) of K.H. (Father), to his son, K.H. (Child).[1] The trial court found grounds for termination under 23 Pa.C.S. § 2511(a)(1), but concluded that termination did not serve Child's needs and welfare under 23 Pa.C.S. § 2511(b). After careful review of the record and law, we reverse.[2]

_____

[1] The trial court granted CYF's petition to terminate the parental rights of Child's mother, S.D. (Mother). Mother did not appeal, and has advised this Court that she "will not be participating" in CYF's appeal. Letter, 1/8/24.

[2] Child's legal counsel, on behalf of Child, has also appealed. Child's appeal is pending before this panel at No. 1512 WDA 2023. Like CYF, Child argues the trial court erred in finding termination did not serve Child's needs and welfare under 23 Pa.C.S. § 2511(b). Child also argues the trial court erred in failing to find grounds for termination under 23 Pa.C.S. § 2511(a)(2), (5), and (8). Our disposition of CYF's appeal resolves Child's appeal and renders it moot.

CASE HISTORY

Child was born in March 2020, at the onset of the Covid-19 pandemic. Father was incarcerated but learned about Child's birth from Mother. N.T., 9/25/23, at 33. CYF obtained emergency protective custody of Child when Child was approximately a week old. N.T., 6/29/23, at 126. Child was "removed from … the hospital" and "placed at his current placement" with C.J. (Foster Mother). *Id.* at 128.

The trial court explained:

[CYF] Caseworker Nicholas Cortazzo was assigned to this case in March of 2020[.] … A dependency petition was filed on March 31, 2020, and [] Child was adjudicated dependent on April 29, 2020. **Since removal in March of 2020, [] Child has never been returned to either parent, and has remained with [Foster Mother, who is an adoptive resource]**. The TPR petition was filed on November 9, 2021. [] Child [was] in placement for 39 months at the date of the TPR [hearing] beginning, and 42 months by its conclusion.

Trial Court Opinion (TCO), 2/12/24, at 4-5 (citations omitted, emphasis added).

The trial court held the termination hearing over three days on June 28, June 29, and September 25, 2023. CYF presented testimony from psychologist, Eric Bernstein (Dr. Bernstein); parole agent, Kyle Butzine (Mr. Butzine); police officer, Leo Gigliotti (Officer Gigliotti); foster care supervisor, Christie Ross (Ms. Ross); and caseworker, Nicholas Cortazzo (Mr. Cortazzo). Father testified in opposition to termination.

*Hearing Day 1 – June 28, 2023*

At the time of the hearing, Child was three years old. N.T., 6/28/23, at 4. Dr. Bernstein testified that he met with Child, Father, and Foster Mother for the first and only time in January 2023. *Id.* at 5-6, 21. Dr. Bernstein conducted interactional evaluations of Child with Father, Child with Foster Mother, and Father individually. *Id.* at 7.

Dr. Bernstein diagnosed Father with "antisocial personality features." *Id.* at 19. He described Father as "somebody [with] a persistent level of defiance against rules and those in authority." *Id.* at 14. Dr. Bernstein expressed "concerns" about Father's "potential to … experience further difficulties with the law" and the "potential impact" on "Father's availability to provide for [C]hild's needs." *Id.* Father was not incarcerated when Dr. Bernstein evaluated him in January 2023. However, Dr. Berstein noted that Father had been incarcerated for approximately 18½ of 26 years from 1996 to 2022. *Id.* at 15. He also noted that Father "had been charged for distributing substances, [and] there's a firearm charge." *Id.* at 20.

After observing Father and Child, Dr. Bernstein described Father's parenting as "authoritative" and "not the ideal," but "also supportive and playful." *Id.* at 24-25. He further opined that the bond between Father and Child "was growing or building" because of Father's "recent … efforts to participate in Child's life." *Id.* at 35-36. Dr. Bernstein added that "[t]here is some issue of absence of cont[ac]t that [Father] has had with [Child.]" *Id.* at

36. Counsel for CYF asked Dr. Bernstein if Father's most recent incarceration in February 2023, "would have any impact on [Child's] bond with Father?" *Id.* Dr. Bernstein replied:

> I would expect as much, yes. So anytime there is an unexplained absence … it is going to have a psychological impact in that [C]hild doesn't have the resources and the appreciation to understand why on one day [F]ather is present and on another day he is gone. That can create a level of insecurity…. I believe with [C]hild it would more [than] likely have an effect.

*Id.* at 36-37. Dr. Bernstein noted that Father's incarceration following the January 2023 evaluation, "would be in line with" Dr. Bernstein's concerns about Father's "availability and dependability." *Id.* at 37-38.

Dr. Bernstein observed that Foster Mother "has been [Child's] caregiver essentially since birth," and refers to Foster Mother as "mommy." *Id.* at 29, 31-32. He testified that Child "views [Foster Mother] as his day-to-day parent, responsible for meeting his needs, so to that extent their bond is strong." *Id.* at 31. When Dr. Bernstein met with Foster Mother and Child, Child "was struggling a bit … with his behavior" and "acting up." *Id.* at 29. According to Dr. Bernstein:

> [A]t one point in the evaluation, [Foster Mother] directed [Child] to clean up the toys. As he was increasing in defiance and wild behavior, she even tried to restrain him as he was sitting on a chair by holding his legs while he shouted for her to let him go. Eventually [Child] relaxed and they did share a moment of playful interaction and even laughter, that was toward the end of the interaction itself.

*Id.* at 30.

Dr. Bernstein identified Foster Mother as Child's "psychological parent." *Id.* at 39. He explained that "being the psychological parent is essentially the world of the child," where "[t]he child sees that person as the one who meets his needs, provides for his clothing, his food, his shelter, his schedule, so it is a pretty important position…." *Id.* at 39-40. Dr. Bernstein opined that removing Child from Foster Mother's care "could have ramifications" because Child "relies upon her for all of his needs." *Id.* at 38. He also stated he "had no concerns" about Foster Mother's caretaking, and noted that Father "acknowledged [Child and Foster Mother] had a bond." *Id.*

Father's counsel cross-examined Dr. Bernstein as follows:

Q. You had classified the bond between [Father] and [Child] as a growing or a building bond; is that correct?

A. Yes, that's correct.

Q. You also had testified to the fact that [F]ather acknowledged the bond between [C]hild and [F]oster [M]other; is that correct?

A. I believe he did, yes.

Q. You had also testified that from [C]hild's point of view[, Foster Mother] is … his psychological parent; is that correct?

A. I did, yes.

Q. In your opinion, do you think [Child] could come to see [F]ather as a person who could meet all of his needs?

A. I don't know the answer to that….

*Id.* at 49.

Dr. Bernstein clarified that he had no recommendation as to whether termination of Father's parental rights would serve Child's needs and welfare. *Id.* at 50-51. He explained:

> I did not make any recommendations on severing the bonds. I can't speak to what has transpired since January [2023,] other than to suggest it's never ideal if one parent with whom the child has a relationship[,] enters his life[,] then is removed without explanation and for a long period, it is never ideal, especially if that's done on a repeated basis.

*Id.* at 50.

Next, Mr. Butzine testified to being Father's parole agent since August 2022. *Id.* at 87. He described Father's "present offense" as having a "4 to 20 year [parole] term" for "drugs with possession and intent to deliver and [] firearms related charges." *Id.* at 97. If Father's parole is not revoked, it ends on May 23, 2032. *Id.* at 124. Mr. Butzine reviewed Father's criminal history from 2007 to 2023. *Id.* at 98-112. He testified that from 2016 to 2023, Father had approximately 39 parole violations. *Id.* at 113.

Mr. Butzine relayed that Father was incarcerated from August 2019 to June 2022. *Id.* at 112. According to Mr. Butzine, approximately six months after Father's release, "we got a[n anonymous] tip that he was involved in drug sales and so we did have concern that he was engaged in that type of behavior again." *Id.* at 118. Mr. Butzine testified that police executed a search warrant at Father's residence on February 8, 2023, and found a "gun … as well as drug manufacturing materials." *Id.* at 122. Consequently, Father

faced new charges, and his parole "was in jeopardy of being revoked." ***Id.*** at 123-24.

*Hearing Day 2 - June 29, 2023*

Officer Gigliotti testified that in December 2022, local police received information from the parole agency about drugs being sold from Father's home.  N.T., 6/29/23, at 6-7.  Officer Gigliotti detailed his involvement in the surveillance and investigation which led to the execution of the search warrant at Father's home.  ***Id.*** at 7-13.  He confirmed that during the search, police discovered drug paraphernalia and a loaded semiautomatic pistol which had been reported stolen.  ***Id.*** at 13-14.  As a result, the Commonwealth charged Father with persons not to possess firearms, receiving stolen property, and prohibited acts related to drug paraphernalia.  ***Id.*** at 16.  Officer Gigliotti indicated that the case was scheduled for trial.  ***Id.*** at 17.

Next, Ms. Ross testified to being a foster care supervisor at Wesley Family Services.  ***Id.*** at 45.  She stated that she had been the family's case manager since the inception of the case in March 2020, when Child was born.  ***Id.*** at 82.  Initially, Ms. Ross's "role was to facilitate visitation with birth parents, attend court hearings, maintain communication with the caseworkers," and visit Child in foster placement.  ***Id.*** at 45-46, 51, 82.  Either Ms. Ross or another case manager would visit Child every 15 days, and Ms. Ross visited Child at least once a month.  ***Id.*** at 46.  By November 2022, Ms. Ross had "taken over" and was visiting Child every 15 days.  ***Id.*** at 46, 70.  She would usually stay for "45 minutes to an hour."  ***Id.*** at 98.

Ms. Ross testified that Child's pre-adoptive home with Foster Mother includes Foster Mother's 17 and 5-year-old daughters. *Id.* at 75, 80-81. Child calls Foster Mother "Mommy" and the five-year-old daughter "Fifi." *Id.* at 76. Ms. Ross stated that Child and the younger daughter play together and "get along very, very well." *Id.* at 81.

Ms. Ross described Child as "very active, [and] very affectionate" with Foster Mother. *Id.* Child seeks comfort from Foster Mother. *Id.* at 76-77. Ms. Ross stated that Foster Mother has "picked him up, she's held him, she's soothed him, she's rubbed his back." *Id.* at 77. She further testified:

> There has been a lot of redirection [when Child] was doing things that weren't safe in the home []. [Foster Mother] would redirect [Child]. She would have him … move to another activity. She did have a little chair she would use for timeout and [Child] would just sit there. She would set a timer and he would be allowed to resume activities after that.

*Id.* According to Ms. Ross, Foster Mother provides for Child's needs. *Id.* at 78-79.

Ms. Ross also participated in Child's visits with Father. *Id.* at 47. She explained that in July 2022, Father began visiting Child twice a week, for one or two hours, at the Wesley Family Services office. *Id.* at 55, 57, 104. To Ms. Ross's knowledge, Father had no prior contact with Child. *Id.* at 55. When Father's counsel asked Ms. Ross "why [Father] had no visits prior to July 15 of 2022," Ms. Ross replied, "I'm assuming because he was incarcerated." *Id.* at 89. Ms. Ross testified that Father visited Child 39 times at the Wesley Family Services office. *Id.* at 103. In September 2022, the visits "moved to

[Father's] home." *Id.* at 63-64, 72-73, 90. Nine of the home visits occurred with a "parenting coach," and 18 visits were unsupervised. *Id.* at 103-04. The last in-person visit occurred on January 27, 2023. *Id.* at 72. The visits became virtual after Father was re-incarcerated. *Id.* at 71.

Mr. Cortazzo, like Ms. Ross, testified to being involved with Child since Child's birth. *See id.* at 182 (Mr. Cortazzo stating he visits Child, "not with Ms. Ross but I do my own visits"). Mr. Cortazzo explained that he was the assigned CYF caseworker "for the entirety of [Child's] life." *Id.* at 106. Child was approximately a week old and still in the hospital when CYF obtained emergency custody and placed Child with Foster Mother. *Id.* at 128. Child has lived with Foster Mother continuously since March 2020. *Id.* When Child was a month old, Foster Mother was appointed as Child's "medical decision-maker." *Id.* at 130. Mr. Cortazzo testified that Father has never "taken part" in Child's care, medical or otherwise. *Id.* at 130, 138.

Mr. Cortazzo confirmed that Father was incarcerated when Child was born in March 2020. *Id.* at 130-31. He stated that Father had relayed having two other children he was "unable to parent" due to his incarceration. *Id.* at 113-14. When Child was born in 2020, Father was aware of Child's birth, but the jail was "closed down" because of the Covid-19 pandemic. *Id.* at 213. Mr. Cortazzo testified that "throughout Father's incarceration," CYF sent Father correspondence about relevant information and court hearings. *Id.* at 235. CYF's communications included information about how to contact the Juvenile Court Project to obtain an attorney. *Id.* According to Mr. Cortazzo,

- 9 -

Father "was well aware of what was going on." *Id.* Father first appeared in court virtually in December 2021; afterward, the trial court noted Father "remains incarcerated," and directed Father "to resolve his criminal charges." *Id.* at 170, 200 (quoting Order, 12/14/21, at 4).[3]

Mr. Cortazzo confirmed that Father was released from prison on June 15, 2022. *Id.* at 140. He relayed that after review hearings in July and October 2022, the trial court found Father had complied with his goals of resolving criminal charges, maintaining contact with CYF, and visiting Child. *Id.* at 138-39, 158, 201. As Father was no longer incarcerated, the trial court ordered him to "[p]articipate in coached parenting, follow the rules of probation, and establish housing." *Id.* at 158. However, the trial court found "continued placement in foster care was appropriate for [Child]." *Id.* at 138-39.

Mr. Cortazzo testified that the trial court ordered "coached parenting" because of "concerns [about Father's] knowledge of [children's] ages and stages and to help Father out." *Id.* at 162-63. Mr. Cortazzo did not know if Father ever raised a child. *Id.* at 162. Father began participating in coached parenting in December 2022, but did not "successfully complete it" because he was re-incarcerated on February 8, 2023. *Id.* at 163-65. Prior to his re-incarceration, Father "had a total of four hours of unsupervised time on

---

[3] During this testimony, the trial court stated it did "not want to hear testimony about probation or parole…. We've [already] had a lot of testimony about [Father] following the rules of probation and parole because clearly he didn't do so." N.T., 6/29/23, at 171.

Mondays." *Id.* at 167. After Father was re-incarcerated, the trial court held a review hearing and again ordered that "Father shall resolve all criminal issues." *Id.* at 173 (quoting Order, 3/27/23, at 3). Mr. Cortazzo testified that Father had not resolved his criminal charges. *Id.* at 171, 173. He explained:

> [E]very time [Father] and I will speak, we speak of what is coming up at court, what has to be resolved. Currently, the only goal he can work on is resolving his criminal [issues]. He is visiting [Child] virtually. [For different reasons,] he has had only two out of four virtual visits that have been set up for him ….

*Id.* at 174.

Mr. Cortazzo supervised one of the virtual visits. *Id.* at 180. He stated that Father "did very well with that visit." *Id.* However, when questioned by Child's counsel about Father's outstanding parenting goals, Mr. Cortazzo responded that Father's current "criminal matter would kind of encompass a lot of that. Then it would be coached parenting[, then] housing …." *Id.* at 208.

Mr. Cortazzo confirmed that at the time of the termination hearing, Child was "a little over three" years old and had been in placement "a little over 39 months." *Id.* at 182. Child had lived with Foster Mother "since his release from the hospital after being born." *Id.* Mr. Cortazzo regularly visited Child at his home with Foster Mother. He stated:

> [Child] is a very energetic little boy. He appears happy. He has a very deep kind of belly laugh. A lot of things make him laugh. But he's doing very well. He seems at ease. He's comfortable. He seems very comfortable around [Foster Mother]. He's pretty affectionate to his family. [With] me, I'm just a jungle gym. But he's just a happy little child.

*Id.* at 182-83.

Mr. Cortazzo described Child's foster sister as "very protective of him. He is sassy to her sometimes just like a little brother would be but it's very loving." *Id.* at 183. If Child exhibits "difficult behaviors," Foster Mother "will redirect." *Id.* at 184. One time, when Mother "did not get a response," Mother "said, do we have to go to timeout and [Child] looked at her and shook his head no. [H]e was pretty straight after that." *Id.* Mr. Cortazzo stated that he "never had an iota of concern for risk or safety or maltreatment of [C]hild ever in [Foster Mother's] home." *Id.* at 218.

According to Mr. Cortazzo, Foster Mother is supportive of Child having continued contact with his biological half-sister "and the rest of the family." *Id.* at 184. Mr. Cortazzo had not spoken with Foster Mother specifically about Child's continued contact with Father in the event of termination and adoption. *Id.* at 185.

CYF's counsel asked Mr. Cortazzo:

Q.          Is [Father] in any way meeting the needs and welfare of [C]hild?

[Mr. Cortazzo].   He is not.

*Id.* at 233.

At the end of the second day of hearing, Father's counsel moved for a directed verdict. Father's counsel stated, "I don't think there was any clear testimony as to how terminating [Father's] parental rights would meet

- 12 -

[C]hild's needs and welfare." *Id.* at 264. Father's counsel suggested, "[a]t this point, we don't have to terminate…. It could be SPLC…."[4] *Id.*

CYF's counsel responded that the parties "[we]re not there to consider alternative permanency goals, [but] to consider the petition … [for] termination of parental rights." *Id.* at 265. CYF's counsel argued against a directed verdict, referencing case law, and asserting that Father "cannot meet the emotional, physical, and developmental needs of [C]hild." *Id.* at 267. CYF's counsel addressed the trial court:

> Dr. Bernstein, as you said yourself, was wishy-washy, didn't come to any conclusions. It is the [c]ourt's place right now to come to the conclusions … with all the information before the [c]ourt[,] which [included] Dr. Berstein's testimony, [] the parole officer['s] and the arresting officer's testimony, and the testimony of the [CYF] caseworker and the testimony of the foster care caseworker[,] and it is your duty to digest all of that information and at that point to determine whether … [there are] grounds [for termination] and would it meet the needs and welfare of [Child] to be able to have permanency through an adoptive home and to be able to live in a home that for three years provided [Child with] the safe, stable, healthy environment that he needs[,] and ensure that his emotional, physical, and developmental needs are being met.

*Id.* at 268-69. CYF's counsel added, "of those 39 months that [Child] was in care, [Father] was incarcerated for all but eight of those." *Id.* at 270. Child's counsel stated she "would echo everything [CYF's counsel] stated. I'm certainly not going to repeat everything. I just wanted the record to be clear…." *Id.* at 273.

_____

[4] SPLC is an acronym for a specialized permanent legal custodian. Father's counsel did not expand on the suggestion of an SPLC.

The trial court expressed concern for Child having "[n]o father, versus a father who loves him, is committed to him, will fight for him, is demanding, like I struggle with that." *Id.* at 272. CYF's counsel responded, "this is why I think that it's important" to "continue the case and hear the testimony of [Father]." *Id.* The court agreed. *Id.* at 273. The court denied Father's motion for a directed verdict and scheduled the third day of hearing. *Id.*

*Hearing Day 3 - September 25, 2023*

CYF recalled Mr. Cortazzo, who testified that Father remained incarcerated and was awaiting a "mid-November" court date. N.T., 9/25/23, at 8. A few weeks prior, Mr. Cortazzo had taken Child to visit Father in jail. *Id.* at 9. Mr. Cortazzo stated that "all in all … it was a good visit." *Id.* at 10. Child and Father also had virtual visits for a half hour on Thursdays. *Id.* at 11.

Father was the final witness. He confirmed he had a November 2023 criminal court date. *Id.* at 32. He also confirmed he was incarcerated from August 2019 to June 2022. *Id.* at 57. Father explained that when Child was born in 2020, the jail was "having issues" with the Covid-19 pandemic. *Id.* Father attempted to contact CYF and eventually connected with a CYF representative, Ms. Davis, who visited him in jail in March, June, and September of 2021, and apprised Father of "what was going on in the case." *Id.* at 35-36, 61. Father stated that after he was released in June 2022, he "had court … as soon as I came home," and had his first visit with Child on July 17, 2022. *Id.* at 38. Father relayed that initially Child "didn't know who

I was," but "started to get to know me, I'm dad." ***Id.*** at 40-41. Since being re-incarcerated in 2023, Father had one in-person visit and several virtual visits with Child. ***Id.*** at 47-49.

Father expressed his opposition to termination, "because the 7 months that I've been in [Child's] life as a man, I know that he needs his father. And every child needs their father." ***Id.*** at 50. Father stated he wants "to be a dad" to Child, and lamented that the "worst thing about being on parole until 2032 [is] somebody can just pick up the phone and make a phone call." ***Id.*** at 54. Father testified that if he "wasn't sitting [in jail], [Child] would be living with me." ***Id.*** at 56.

After the close of evidence, counsel for CYF and, Child, and Father argued their positions before the trial court. ***Id.*** at 73-112. The trial court did not issue a decision on the record. On November 29, 2023, the trial court entered an order and findings of fact. The trial court found CYF met its burden of proving grounds for termination under 23 Pa.C.S. 2511(a)(1), but denied termination on the basis that it "does not serve [Child's] needs and welfare." Order, 11/29/23.

CYF timely filed a notice of appeal and concise statement of errors pursuant to Pa.R.A.P. 1925. The trial court issued an opinion on February 12, 2024.

## ISSUE

CYF presents the following issue for review:

WHETHER THE [TRIAL] COURT ERRED AS A MATTER OF LAW AND/OR ABUSED ITS DISCRETION IN DENYING [CYF]'S PETITION TO INVOLUNTARILY TERMINATE THE PARENTAL RIGHTS OF [FATHER,] AFTER CYF PROVED BY CLEAR AND CONVINCING EVIDENCE THAT TERMINATION OF [FATHER]'S PARENTAL RIGHTS WOULD BEST SERVE THE DEVELOPMENTAL, PHYSICAL AND EMOTIONAL NEEDS AND WELFARE OF THE CHILD PURSUANT TO 23 PA.C.S.[] § 2511(b)?

CYF's Brief at 5.

### DISCUSSION

#### A. Standard of Review

The petitioner seeking to terminate parental rights must prove by clear and convincing evidence, "the existence of the statutory grounds for doing so." ***In re Adoption of C.M.***, 255 A.3d 343, 358 (Pa. 2021) (citations omitted). This Court's review "is limited to a determination of whether the [order] of the termination court is supported by competent evidence." ***Id.*** "This standard of review … requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law." ***Id.*** An appellate court "must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." ***Id.*** at 358-59 (citation omitted).

#### B. Adoption Act

The grounds for involuntarily terminating parental rights are set forth in the Adoption Act at 23 Pa.C.S. § 2511. First, the trial court must focus on the parent's conduct pursuant to Section 2511(a). ***Id.*** If the court finds grounds

for termination under Section 2511(a), it must assess evidence of the child's needs and welfare, "giving primary consideration to the developmental, physical and emotional needs and welfare of the child." **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (citing 23 Pa.C.S. § 2511(b)).

Instantly, the trial court found grounds for terminating Father's parental rights under Section 2511(a)(1), which provides for termination when:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1). However, the trial court also found that termination did not serve Child's needs and welfare under Section 2511(b).

*C. Parties' Arguments*

CYF disputes the trial court's finding as to 2511(b), and asserts it "proved[,] by clear and convincing, competent, and substantial evidence," that termination "would best serve the developmental, physical, and emotional needs and welfare" of Child. CYF's Brief at 20.

According to CYF:

> The [trial c]ourt erred at law by deciding that termination does not meet the needs and welfare of [C]hild based upon conduct of [Father] which occurred entirely after the TPR petition was filed and served. Prior to the TPR petition being filed and served, [Father] and [Child] had never met. They did not meet until 7 months after the TPR petition was filed. To find there was a bond and use that factor as a basis for denying termination was an error of law.

> The [trial c]ourt ignored the weight of competent evidence that [Child] does not have a necessary and beneficial bond with

- 17 -

[Father], that his necessary and beneficial bond is with [F]oster [M]other, that [Father's] years of incarceration and parole violations have interfered with his ability to provide [Child] with the safety, stability, and permanency that he deserves and to which he is entitled under law. The [trial c]ourt committed an abuse of discretion by ignoring the weight of competent evidence that [Child's] needs for permanency, safety and stability outweigh his need to continue a parental relationship with [Father].

*Id.* at 20-21.

As noted, Child's counsel, on behalf of Child, agrees with CYF and has filed a separate appeal which is pending before this panel. As Appellee in this case, Child argues the trial court "failed to perform an appropriate needs and welfare analysis[,] resulting in the court incorrectly concluding that termination would not serve Child's needs and welfare and denying CYF's termination petition." Appellee's (Child's) Brief at 28; **see also id.** at 28-45.

To the contrary, Father argues the trial court properly found termination did not serve Child's needs and welfare. Father concedes that at "the time of the hearing, there was no information regarding how long Father may be incarcerated," and that "Child views Foster Mother as his 'provider since essentially days after birth.'" Appellee's (Father's) Brief at 15. However, Father maintains that the "record reflects a bond between Father and Child not only exists[,] but provides a structure that is necessary for [] Child's well-being." *Id.* at 2. He asserts that severance of the bond "would not be beneficial to Child and would rob Child of an opportunity to grow the bond further and enjoy a relationship with Father that is essential to the well-being of Child and his future." *Id.* at 15.

D. *In the Interest of K.T.*

We consider the parties' arguments mindful of the Pennsylvania Supreme Court's decision in *In the Interest of K.T.*, 296 A.3d 1085 (Pa. 2023). In *K.T.*, the Supreme Court examined "whether the trial court may deny termination under subsection (b) after considering only the child's bond with h[is] parent and finding an 'adverse effect' or 'detrimental impact' of severing that bond." *Id.* at 1104. The Court "emphasize[d] the pivotal language from Section 2511(b)," stating:

> In interpreting a statute, we first consider the statute's plain language and may ascribe to its words and phrases the meaning they have acquired through their common and approved usage and in their context of the overall statutory scheme. … The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the "primary consideration" must be the child's "developmental, physical and emotional needs and welfare." This of course requires the court to focus on the child and consider all three categories of needs and welfare. Although subsection (b) itself does not specify a method for determining whether granting or denying termination best serves the child's needs and welfare, our case law has provided some elucidation of this requirement.

*Id.* at 1105 (citations omitted).

The Supreme Court cited precedential case law in explaining:

> Notably, courts should consider the matter from the child's perspective, placing h[is] developmental, physical, and emotional needs and welfare above concerns for the parent. *See C.M.*, 255 A.3d at 358 ("A parent's right to make decisions concerning the care, custody, and control of his or her children is among the oldest of fundamental rights. [However, t]he time-tested law of the Commonwealth requires that we balance this intrinsic parental interest within the context of a child's essential needs for a parent's care, protection, and support.") (citations omitted); *In*

- 19 -

*re H.S.W.C.-B*, [] 836 A.2d 908, 911 ([Pa.] 2003) (In termination proceedings and appeals, "the best interest of the children is always paramount[.]"). *Cf. In re R.I.S.*, [] 36 A.3d 567, 579 ([Pa.] 2011) (plurality opinion) (Baer, J., concurring) ("It is incumbent upon the judicial system to be child-focused. Regardless of the heartbreak to a parent, children are entitled to every opportunity for a successful life, and a permanent, loving parental relationship greatly fosters that opportunity.").

***

Moreover, the child's "emotional needs" and "welfare" include "intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and brackets omitted). As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider "whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268; *see e.g.*, *In re D.C.D.*, [] 105 A.3d 662, 677 ([Pa.] 2014) (trial court properly considered child's "strong bond with her foster family with whom she has lived nearly all her life and who has indicated a desire to adopt her" pursuant to Section 2511(b)). And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which "is not always an easy task." *T.S.M.*, 71 A.3d at 267.

*Id.* at 1105-06 (footnote omitted).

The Supreme Court in *K.T.* observed, "Our unanimous decision in *T.S.M.* also highlighted the importance of permanency and the need to find stability for dependent children in a timely fashion." *Id.* at 1107. The Court stated:

As then-Justice Baer stated so eloquently, courts considering a termination petition "must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development **quickly**." [*T.S.M.*, 71 A.3d] at 269 (emphasis added). The *T.S.M.* Court acknowledged Pennsylvania's "dual focus [on] reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons," in accordance with

> federal law. *Id.*; *see* 42 U.S.C. § 675(5)(E)(ii) (ASFA[, the
> Adoption and Safe Families Act,] requires agencies in participating
> states to move for termination when children have been in foster
> care for fifteen of the most recent twenty-two months, in the
> absence of compelling reasons termination would not be in child's
> best interests); 42 Pa.C.S. § 6351(f)(9) (courts must determine
> at each permanency hearing, *inter alia*, "whether the county
> agency has filed or sought to join a petition to terminate parental
> rights and to identify, recruit, process and approve a qualified
> family to adopt the child"). *T.S.M.* further advised courts to move
> away from "concurrent planning" for reunification, and towards an
> alternative permanent home, "when it becomes clear [ ] parents
> will be unable to provide [for] their children's basic needs in the
> near future[,]" *e.g.*, after a permanency goal change to adoption.
> *See id.* at 271-70. Otherwise, courts might "create confusion for
> the children and potentially increase the difficulty for them to bond
> with preadoptive parents, thus perpetuating the problem of foster
> care drift." *Id.* at 270.

*Id.* at 1107–08 (footnotes omitted).

Ultimately, the Supreme Court concluded that the trial court improperly focused its needs and welfare analysis "only on whether severing the parental bond would have an 'adverse' or 'detrimental' impact on [the c]hild[,] … above all other elements that should comprise a complete subsection (b) needs and welfare analysis." *Id.* at 1112. The Court further "clarified the standard for courts applying 23 Pa.C.S. § 2511(b) … including all factors that must be considered by the court in that analysis[.]" *Id.* at 1117. Thus, when a trial court analyzes a child's needs and welfare, it must consider: (1) whether the child and parent share a "necessary and beneficial" bond; (2) the child's need for permanency and length of time in foster care consistent with 42 Pa.C.S. § 6351(f)(9) and federal law ASFA, 42 U.S.C. §§ 675(5)(C), (E); (3) whether

the child is in a pre-adoptive home and bonded with foster parents; and (4) whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability. *Id.* at 1113; *see also id.* at 1117 (Wecht, J., dissenting) (referencing the "four-factor test").

E. Application of *K.T.*

Applying *K.T.* to this case, we conclude that the trial court denied termination "based on a legally erroneous application of Section 2511(b)." *Id.* at 1114. Although the trial court referenced *K.T.* and the necessity of considering multiple factors, it failed to properly do so. The trial court divided the four factors into five, stating:

> The [*K.T.*] analysis includes, but is not limited to: (1) whether the bond is necessary and beneficial to the child; (2) whether maintaining the bond serves the child's developmental, physical, and emotional needs; (3) the child's need for permanency and length of time in foster care; (4) whether the child is in a preadoptive home and bonded with foster parents; and (5) whether the foster home meets the child's development, physical, and emotion[]al needs, including intangible needs of love, comfort, security, safety, and stability.

TCO at 26 (citation omitted).

The trial court noted its "discretion to give appropriate weight to these factors" and "proceed 'with an eye to the best interest and the needs and welfare of the particular child[] involved.'" *Id.* (citing *K.T.*, 296 at 1113). The court then discussed the factors under three headings: "Parental Bond"; "Foster Parent Bond"; and "Permanency and Whether the Foster Home Meets the Child's Needs." *Id.* at 26-29.

The trial court "did not find the opinions of Mr. Cortazzo or Ms. Ross to be persuasive." *Id.* at 30. Rather, the court focused almost exclusively on Dr. Bernstein's testimony, describing the testimony as "credible, but largely unhelpful." Findings of Fact (FOF), 11/29/23, at 2 (stating Dr. Bernstein "was handicapped by limited information … and his [January 2023] evaluations were dated in the dynamic timeline of this case").

We examine the trial court's findings under the four factors set forth in *K.T.*:

**(1) *Whether Child and Father share a necessary and beneficial bond***

The trial court concluded that Child and Father share a necessary and beneficial bond, "that is of great value to [Child], not simply because it exists, but because the structure and support that it offers is essential to [C]hild's future." TCO at 30. This conclusion lacks support.

Preliminarily, we note the trial court made the unsupported finding that "Child now considers both Father and Foster Mother to be psychological parents." *Id.* at 29. The court does not cite evidence to support this finding beyond its reference to Dr. Bernstein stating:

> [Foster Mother] serves as [Child's] psychological parent with the understanding that since his first weeks of life, she provides for his daily needs, and offers a safe and stable home in which to raise him. Granted, with [F]ather's recent inclusion and active participation in visits, [Child] has since shifted in sharing his life with [F]ather and [Foster Mother].

*Id.* (quoting Dr. Bernstein without citation). This statement does not support a finding that Father is Child's psychological parent.

With regard to supported findings, the trial court recognized that "Father started visitation in August of 2022," and "[u]nsupervised visitation bega[]n in October of 2022," when Child was two-years-old and Father was released from prison. *Id.* at 6. Relying on Dr. Bernstein's testimony, the court found, "[g]enerally, visits went well between Father and Child." FOF at 8. The court emphasized Dr. Bernstein's statement that "the bond between Father and [] Child is 'building [or] growing.'" *Id.* at 15 (citation omitted).[5]

The trial court acknowledged Dr. Bernstein's testimony "that his assessment of bond was complex, and can't be based on a single

---

[5] The trial court appears to be influenced by CYF's actions relative to Father during Father's incarceration. The trial court stated, "Mr. Cortazzo testified that during Father's incarceration at the beginning of this case in March of 2020, [CYF] did nothing to assist Father in arranging visits, getting an attorney or being assessed to establish goals until his release in 2022." TCO at 7 (citing N.T., 6/29/23, at 197). The trial court does not mention the advent of Covid-19, which coincided with Child's birth in March 2020. Mr. Cortazzo testified that when Child was born, the jail was "closed down" because of Covid, and "was [not] accepting in-person visits." N.T., 6/29/23, at 197, 213. Thus, with regard to assisting Father "at this time," Mr. Cortazzo stated, "[w]e did nothing." *Id.* at 197. Also, when Father's counsel asked Mr. Cortazzo if he had called the jail about visitation more recently, Mr. Cortazzo answered:

> A. Called about the lockdowns? Someone else called about the prolonged lockdown because of what was going on at the jail. So, yes, there has been conversation with the jail, but [there] has never been a very clear answer. Sometimes they will say staffing. Like I said, they closed the one pod down for a while but over the last few months it's been difficult to have visits –
>
> Q. Okay.
>
> A. -- overall.

*Id.* at 204.

interaction[.]" TCO at 13. The court noted Dr. Bernstein's opinion that the bond between Father and Child "could indeed be impacted by any unexplained absences of Father from [] Child's life[, which could] cause[] instability in that [C]hild [would] question whether or not he can trust the relationship to be stable." FOF at 15. The court further found:

> [Dr. Bernstein made no] recommendations on severing the bond[ because he] can't speak to what has transpired since January [2023,] other than to suggest it's never ideal if one parent with whom the child has relationship enters his life and then is removed without explanation and for a long period, it is never ideal[,] especially if that's done on a repeated basis.

*Id.* at 17-18 (citation omitted). The trial court stated it "can't speculate as to what Father's future holds in terms of potential incarceration." *Id.* at 23.

The above findings, while supported by the record, do not support the trial court's conclusion that Father and Child share a necessary and beneficial bond "of great value … because the structure and support that it offers is essential to [C]hild's future." TCO at 30. It bears repeating that the trial court's decision must be supported by competent evidence. *C.M.*, 255 A.3d at 358. Moreover, as a reviewing court, we are not required "to accept the lower court's inferences or conclusions of law." *Id.* The trial court's findings indicate that Father and Child do not share a necessary and beneficial bond. *See K.T.*, 296 A.3d at 1109-11 (collecting cases and stating "[i]t is only a necessary and beneficial bond ... that should be maintained when Section 2511(b) mandates the child's needs and welfare are of 'primary' importance.").

- 25 -

Here, the trial court found Father has been incarcerated for the majority of Child's life; Father met Child for the first time in 2022 (after CYF filed the TPR petition and Father was paroled); Father most recently had limited visits with Child due to Father's re-incarceration in 2023; and Father remained incarcerated during the termination hearing due to new and parole violation charges. These findings indicate that Father and Child do not share a necessary and beneficial bond. The trial court erred in finding otherwise.

**(2)** ***Child's need for permanency and length of time in foster care consistent with Pennsylvania and federal statutes***

The trial court erred by disregarding Child's need for permanency and length of time in Foster Mother's care "consistent with" Section 6351(f)(9) of Pennsylvania's Juvenile Act, and Section 675(5)(C) and (E) of the federal ASFA.[6] ***K.T.***, 296 at 1113 ("The Section 2511(b) inquiry must also include

_____

[6] The Juvenile Act requires the trial court to determine:

> (9) If the [dependent] child has been in placement for at least 15 of the last 22 months … [and] whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child….

42 Pa.C.S. § 6351(f)(9). Similarly, the ASFA states:

> **(C)** with respect to [a dependent] child, (i) procedural safeguards will be applied, among other things, to assure each child in foster care under the supervision of the State[,] of a permanency hearing to be held … no later than 12 months after the date the child is considered to have entered foster care … (and not less

*(Footnote Continued Next Page)*

- 26 -

consideration of … the child's need for permanency and length of time in foster care consistent with 42 Pa.C.S. § 6351(f)(9) and federal law AFSA, 42 U.S.C. §§ 675(5)(C), (E)").

The Pennsylvania Supreme Court explained that "the federal government enacted ASFA and related statutes to address the problems of foster care drift and ensure that dependent children are provided permanent homes either through reunification or adoption." *In re D.C.D.*, 105 A.3d 662, 675 (Pa. 2014).

Likewise, this Court has referenced Section 6351 and recognized that Pennsylvania's Juvenile Act was "amended … to reflect the stated policy of ASFA to preserve the unity of the family whenever possible[,] or to provide another permanent family when the unity of the family cannot be achieved." *In re W.M.*, 41 A.3d 618, 624 (Pa. Super. 2012) (citation omitted). In

---

frequently than every 12 months thereafter during the continuation of foster care), which hearing shall determine the permanency plan for the child that includes whether, and if applicable when, the child will be returned to the parent, placed for adoption and the State will file a petition for termination of parental rights, …

**(E)** in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months, … the State shall file a petition to terminate the parental rights of the child's parents … and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption…[.]

42 U.S.C. § 675(5)(C), (E).

discussing the Adoption Assistance and Child Welfare Act (AACWA), we explained:

> It has been the national, [s]tate and local policy for many years … to remove children from foster placement limbo where they know neither a committed parent nor can look toward some semblance of a normal family life that is legally and emotionally equivalent to a natural family. The [AACWA] provides that [s]tates will be reimbursed for a percentage of foster care and adoption assistance payments when the [s]tate satisfies the [AACWA's] requirements. **States such as Pennsylvania, which participate in the program, are required to make reasonable efforts to return the child to [his or her] home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by such reasonable efforts, to move toward termination of parental rights and placement of the child through adoption**. Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation in [ASFA] (Public Law 105–89, 111, stat. 2119). **Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship**, **the needs and welfare of the child require CY[F] and foster care institutions to work toward termination of parental rights, [and] placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months**.

*Id.* at 623-24 (citations omitted, emphasis added).

The trial court found Child had been in foster placement since March 2020, "and has remained with his original foster parent," Foster Mother. TCO at 4-5. The court specified, "Child has been in placement for 39 months at the date of the TPR trial beginning, and 42 months by its conclusion." *Id.* at 5; FOF at 4-5 (citations omitted). The court noted CYF's "main concern is

Father's ability to be available and present to parent [C]hild." TCO at 6. The court also quoted Dr. Bernstein saying, "certainly permanency is an important step but I understand this case is complicated so however it unfolds is to be determined." *Id.* at 15 (citation omitted).

Despite these findings, and contrary to the Supreme Court's directive, the trial court ignored the Pennsylvania and federal statutes. *K.T.*, 296 at 1113. The "needs and welfare of the child require CYS … to work toward" permanency, *In re W.M.*, 41 A.3d at 624, while the Juvenile Act and ASFA mandate permanency for dependent children who have "been in placement at least 15 of the last 22 months." 42 Pa.C.S. § 6351(f)(9); 42 U.S.C. § 675(5)(C), (E). Therefore, the trial court erred by disregarding Child's needs and welfare consistent with Pennsylvania and federal statutes.

### (3) *Child's placement in a pre-adoptive home and bond with Foster Mother*

It is undisputed that Child lives with Foster Mother in a pre-adoptive home. In addressing the bond between Child and Foster Mother, the trial court emphasized "the doctor's" descriptions of interactions between Foster Mother and Child as "incident after incident of the actions of a disrespectful, out of control child who struggled with his behavior." TCO at 28. Presumably the trial court was referring to Dr. Bernstein's account of Child's behavior with Foster Mother. *Id.* at 28-29; *see also* N.T., 6/29/23, at 30 (Dr. Bernstein describing Child's behavior with Foster Mother as "increasing in defiance and wild"). The court contrasts Child's interactions with Foster Mother with Dr.

Bernstein's account of Child's interactions with Father. TCO at 28 (stating, without citation, that "[w]hile in Father's care, [C]hild was described as 'well controlled and respectful'").

The trial court recognized that Dr. Bernstein's assessments were based on a "single interaction." *Id.* at 13. Therefore, "Dr. Bernstein was unable to speak to whether termination of parental rights would have a detrimental impact on Child[,] 'because [he had] not seen any of the parents since January [2023].'" *Id.* at 15. The court also found Child had lived with Foster Mother "[s]ince removal in March of 2020," and "has remained with" Foster Mother. FOF at 4. The court quoted Dr. Bernstein's statement that removing Child from Foster Mother's care "'could have ramifications' but 'it all depends on where [Child] is placed and with whom and how his life would change thereafter and the relationship [Child] may have if, for example, [he] is placed with [F]ather or [F]ather's family." *Id.* at 16 (citations omitted). Moreover, the court found: "Importantly, Father acknowledged that [F]oster [M]other and [] Child have a bond," which "is in line with Dr. Berstein's observation that at the time of the [January 2023] evaluation, [] Child viewed [F]oster [M]other as his psychological parent." *Id.* (citing N.T., 6/28/23, at 39).

The trial court implied, but did not expressly conclude, that Child and Foster Mother share a bond. The court found Dr. Bernstein to be credible, and quoted Dr. Bernstein's testimony that Foster Mother was Child's psychological parent; removing Child from Foster Mother "could have ramifications"; and, "[i]mportantly," Father acknowledged that Child and Foster Mother "have a

bond." TCO at 3, 14-15. These findings support the inference that Child is in a pre-adoptive home and bonded with Foster Mother.

### (4) *Whether the foster home meets Child's developmental, physical and emotional needs, including love, comfort, security safety and stability*

As discussed, the trial court acknowledged that Child viewed Foster Mother as his psychological parent. TCO at 15 (citing N.T., 6/28/23, at 39). Nonetheless, the court equivocated about Foster Mother meeting Child's needs. For instance, the court opined, "[m]erely being the individual [with] whom the child has spent the greater time does not satisfy th[e] requirement" of providing for a child's "developmental, emotional, and psychological needs"; the court then credited Dr. Bernstein's testimony that Foster Mother has provided for Child's daily needs throughout Child's life. *Id.* at 29. Despite the court's reticence, its findings support the conclusion that Foster Mother meets Child's developmental, emotional, and psychological needs.[7]

### CONCLUSION

The trial court erred in deciding that termination did not serve Child's needs and welfare under Section 2511(b). The trial court's supported findings indicate: (1) Child and Father do not share a necessary and beneficial bond; (2) Child's foster placement in excess of 15 of 22 months compels permanency

---

[7] While the trial court did not find "the opinions" of Ms. Ross and Mr. Cortazzo "to be persuasive," TCO at 30, and did not address their testimony about their knowledge of facts, both Ms. Ross and Mr. Cortazzo corroborated Dr. Bernstein's testimony that Foster Mother has provided for Child's "daily needs" and "a safe and stable home." *Id.* at 29.

(in this case, adoption) required by Pennsylvania and federal law; (3) Child is in a pre-adoptive home and bonded with Foster Mother; and (4) Foster Mother meets Child's developmental, physical, and emotional needs. Consequently, termination of Father's parental rights serves Child's needs and welfare.

We reverse the trial court's order denying termination of Father's parental rights. On this record, remand for further proceedings is not necessary.[8] *See Hanna v. Key Computer Sys., Inc.*, 562 A.2d 327, 329 (Pa. Super. 1989) (reversing trial court order where, "[w]e have not … simply engaged in the substitution of our judgment for that of the trial court. Rather, we have a deep and serious difference of opinion with the trial court as to the effect of the application of the law to the facts of the case"); *Bender v. Bender*, 395 A.2d 279, 284 (Pa. Super. 1978) ("Sometimes, when an award of custody has not been explained, we have remanded for further review. Other times, we have found remand unnecessary because the record makes it clear where the child's best interest lies").

_____

[8] In *K.T.*, the Supreme Court remanded the case to the trial court because the trial court "focused [its] Section 2511(b) analysis only on whether severing the parental bond would have an 'adverse' or 'detrimental' impact on [the c]hild and, finding such impact was supported by the record, concluded this one factor precluded termination." *K.T.*, 296 A.3d at 1112. The Supreme Court emphasized that an appellate court may not decide "fact-bound claims," and declined to "order termination of [] parental rights on this record." *Id.* at 1117 (remanding for the trial court "to review the record or further develop it with the foregoing clarification of the 2511(b) analysis in hand"). Here, remand is not necessary given the trial court's record-based findings.

Order reversed. Case remanded with instructions to enter an order terminating Father's parental rights. Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/11/2024